**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARY ANN BEDOSKY,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:04-1369** |
| **V.** | : | **(NEALON, D.J.)** |
| | : | **(MANNION, M.J.)** |
| **JO ANNE B. BARNHART, Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) to determine whether there is substantial evidence to support the Commissioner's decision to deny the plaintiff's claim for Social Security Disability Insurance Benefits, ("DIB"), under Title II of the Social Security Act, ("Act"). 42 U.S.C. §§ 401- 433.

**I. Procedural Background**

The plaintiff protectively filed her application for benefits on January 6, 2003, in which she alleged that she had become disabled on September 5, 2001, due to a hip and back injury, Hodgkin's Disease, breast cancer, thyroid cancer, spleen removal, carpal tunnel syndrome in both hands, neck, left leg and arm pain, migraine headaches and nerve damage to the left calf. (TR. 14, 89-90). After her claim was denied initially, (TR. 56-61), the plaintiff's application eventually came on for a hearing before an administrative law

judge, ("ALJ"), on March 9, 2004. At that hearing, plaintiff was represented by different counsel than is representing her in this appeal. In addition to the plaintiff's testimony, the ALJ heard the testimony of Karen Kane, a vocational expert. (TR. 28-53).

On March 22, 2004, the ALJ issued a decision in which he found the following: that the plaintiff met the disability insured status requirements of the Social Security Act as of September 5, 2001, the onset date of disability, and continues to meet those requirements until December 31, 2007; that the plaintiff had not engaged in substantial gainful activity since the onset date of September 5, 2001; that although the plaintiff did work for a period of time subsequent to September 5, 2001, that work was determined not to be substantial gainful activity ("SGA") because it was sporadic and the wages verified were under SGA levels. The plaintiff ceased working in May 2002, but she did work one day in September 2002 in order to maintain her health insurance.

The ALJ further determined that: the medical evidence of record established that the plaintiff did have severe impairments, but that these impairments were not so severe as to meet or equal the requirements of any of the listed impairments set forth in Appendix I, Subpart P, Social Security Administration Regulations No. 4; the plaintiff was not entirely credible in stating her limitations; the plaintiff did not have the residual functional capacity to perform any of her past relevant work, but she did retain the functional capacity to perform sedentary work with certain restrictions, and that there

were positions available in the national and state economies which she could perform.  As a result, the ALJ concluded that the plaintiff had not been under a "disability," as defined in the Social Security Act, at any time relevant to the application. (TR. 20).

The plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which was denied on April 30, 2004. (TR.6-10). Thus, the ALJ's decision stood as the final decision of the Commissioner. Currently pending before the court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on June 25, 2004.  (Doc. No. 1).

**II. Disability Determination Process**

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 C.F.R. § 404. 1520.

The instant decision was ultimately decided at the fifth step of the process, when the ALJ determined that the plaintiff had the residual functional capacity to perform sedentary work with restrictions. (TR. 19).

**III. Evidence of Record**

The plaintiff was born on May 12, 1958. (TR. 31, 76). She has a high school education and vocational training in nursing. (TR. 18, 32, 96). Her past relevant work includes work as an LPN and nurse's aide. (TR. 15, 32, 104).

The evidence and medical records have been carefully reviewed. It is not necessary, however, to undertake an in-depth discussion of the evidence at this time because our recommendation is that this matter be remanded to the Commissioner with instructions that a medical consultation be obtained to assess the claimant's medical condition, in particular, the avascular necrosis and the L4-5 disc problems. Our further recommendation is, if another hearing is necessary, that the matter be reassigned to a new ALJ, and that a medical examiner be present at the next hearing to testify.

We will briefly set forth only a portion of the plaintiff's long and complex medical history. The plaintiff has worked for approximately 25 years as a licensed practical nurse and nurse's aid at the Luzerne County Valley Crest Nursing Home. She returned to work several times, despite a series of serious illnesses. Her medical history includes, among other things: Hodgkins disease, treated with a splenectomy, in remission; history of left breast cancer treated with mastectomy, radiation and eventual tram flap reconstructive surgery, (TR. 170); thyroid papillary carcinoma, in remission, (TR. 175); sinus surgery, (TR. 277); a traumatic fall on ice on January 21, 2003, resulting in severe facial lacerations and reconstructive surgery, and

injury to her hands, (TR. 272); carpal tunnel syndrome; a herniated disc at L4-5, with lumbar scoliosis to the right, and left L5-S1 radicular component; hernia repair; back, left hip, thigh and calf pain; migraine headaches, and probable avascular necrosis due to the various cancer treatments. (TR. 172, 178, 193, 260).

The plaintiff was injured at work on September 5, 2001, when she and a co-worker attempted to lift an unstable patient. She underwent hernia repair on October 4, 2001. (TR. 167). Although the result was largely positive, the plaintiff continued to complain of lower back pain radiating into her left hip, thigh and calf, and associated instability in that area. The plaintiff did return to light duty part time work after the injury. She wrote that she tried to return to work because she "needed insurance." (TR. 104). She stated that she stopped working when her boss told her she could use moist heat only during her breaks and on her lunch period. (TR. 124).

**IV. Discussion**

The plaintiff argues that the ALJ's credibility determinations regarding the plaintiff's statements relating to her pain and physical limitations are not supported by substantial evidence. Specifically, she maintains that the ALJ failed to resolve conflicts created by countervailing evidence in the record, and notably did not address the primary physician's treatment records. She also complains that the ALJ erred in failing to have a medical expert available to testify at the hearing. (Doc. No. 14).

The Commissioner argues that the record demonstrated that there was no need to have a medical expert available at the hearing, and that the sole issue before the court is whether substantial evidence supports the ALJ's conclusion that, despite her severe impairments, the plaintiff could perform modified sedentary work for an 8-hour day. (Doc. No. 15).

Having carefully considered the record before us, the sole issue we consider is whether the plaintiff was afforded full and fair consideration of her application for disability benefits. We conclude that the plaintiff did not receive a full and fair consideration of her claim, for a number of reasons which are discussed below.

Not only does it appear that this matter was not sufficiently investigated at the Agency level, it is readily apparent that it also was not fairly reviewed at subsequent levels.[1] The record as filed with this court is incapable of meaningful review. A significant portion of it is virtually undecipherable. It is cause for concern that the record being as it is, the ALJ did not recognize his responsibility to remand the matter to the Agency for further investigation and development of the record.

For example, the plaintiff's primary treating physician is Janusz F. Wolanin, M.D, whose records cover the period November 13, 2000 through

---

[1] We do take note, however, that at the first review level of this claim it appears that the reviewer was inclined to approve the claim. Her recommendation was an amended onset date. *See* TR. 87-88. On further review, however, the claim was denied. A "remarks" notation on the denial worksheet states "Disability Redesign Prototype Case." (TR. 56).

March 10, 2003 are largely illegible. (TR. 208-270). Notably, the ALJ does not refer to these records, probably because he could not read them.

In addition, many other pages of the record allegedly relied upon by the ALJ in making his conclusions are also unintelligible. The ALJ stated in his decision that he relied in large part upon the opinions expressed by Agency consultants regarding the plaintiff's residual functional capacity because "their conclusions are consistent with other substantial evidence of record." (TR. 19). Our review reveals, however, that the one Agency non-treating, non-examining physician's undated Residual Functional Capacity Assessment is almost unintelligible, except for the check-the-box responses. This is also true of an Agency check-the-box Psychiatric Review Technique form dated June 26, 2003, which indicated that there was "no medically determinable impairment." (TR. 301-307, 309-322). A physician's physical capacity form, standing alone, is not substantial evidence. Green v. Schweiker. 749 F.2d 1066, 1071, n.3 (3rd Cir. 1984); *See also* Mason v. Shalala, 944 F.2d at 1065 ("Form reports in which a physician's obligation to check a box or fill in a blank are weak evidence at best..."). We also note that the ALJ did not state why or how these opinions are "consistent with other substantial evidence of record."

The substance of the plaintiff's claim is that the cumulative effect of her many illnesses and accidents is such that she is now in too much pain to work an 8-hour day, even with accommodation and restrictions. The plaintiff wrote on March 13, 2003, in response to a question posed by the Agency:

Dear Sirs:

7

> It is hard to put into words the pain or discomfort. It is constant in some [form]. I had cancer 3 [times] and still [tried] to go back to work. It is hard for me to admit I just can't work 8 hours any more. I worked 4 hours and still needed moist heat and pain medication. I started work when I was 6-8 years old on a farm. I can't do any thing for long periods of time anymore then stop and take medication and heat. I have carpal tunnel in hands, [right] hand worse. I fell in [January] and pain in the right hand [increased], and is constant now...
>
> ...I do need help from family and friends to do some jobs. My boss told me I can't use moist heat any time... just my break and lunch. I am sorry I have to ask for comp. I never thought it would come to this but it did.
>
> I worked my whole life and it is very hard to admit I can't do it anymore, but I can't. I keep trying but pain and discomfort stop me. ..I am asking for disability so I don't have to worry and lose everything I worked so hard for. Maybe one day I will be able to return to work. I will aim for that.

(TR. 124).

In an effort to discredit the plaintiff's statements regarding her pain and physical limitations, especially as they pertained to the pain and instability in her left leg and hip, the ALJ wrote:

> An MRI of August 8, 2002...shows early avascular necrosis (AVN), the right greater than the left. The claimant's complaints are of the left. Also noted is her statement that her left hip pops out with some frequency. However, an x-ray of October 11, 2002...shows joint space to be well preserved.

(TR. 18). In fact, the record demonstrates that the plaintiff was complaining of left hip pain and instability consistently from the time of the September 5, 2001, work-related lifting injury.

The plaintiff's treating surgeon, John A. Kline, M.D., described the work injury as "traumatic L4-5 work related disc herniation" on August 6, 2002.(TR.

8

178). He noted that the plaintiff had positive straight leg raise on the left, and positive Patrick's test on the left.  His diagnoses also included probable left L5-S1 radicular component; left greater trochanteric bursitis, and chronic left hip pain with questionable AVN. (TR. 178-179). Dr. Kline administered several left trigger point injections which were not helpful in alleviating the plaintiff's pain.  Dr. Kline recommended a neurological evaluation, which apparently never took place. (TR. 179-181).

These reports lend credence to the plaintiff's stated complaints of left hip pain and instability. There are other records which report similar findings. On August 26, 2002, Frank O'Brien, M.D. recorded that the plaintiff was complaining of left hip and leg pain and noted "abnormalities on the MRI in both hips." (TR. 194).[2] He later rendered a diagnosis of left piriformis syndrome[3] on October 11, 2002, and reported that the plaintiff had positive tenderness over the left sciatic notch area. (TR. 189).

As another demonstration that the plaintiff was not credible, the ALJ wrote, "...she testified that she sustained a cut over her eye when her leg gave

---

[2] Other documented reports of left hip and leg pain occur at TR. 57-158; 160 -162; 180; 182 and187.

[3] Piriformis syndrome: A condition marked by pain in the hip and buttock that radiates up into the lower back and down the leg...This is caused by entrapment of the sciatic nerve as it passes through the piriformis muscle in the buttock.  Because the symptoms mimic those caused by a herniated lumbar disk, the syndrome may be confused with that disease..." Taber's Cyclopedic Medical Dictionary at 1591 (19th ed. 2001).

out and she fell. However, she told Dr. Collini that she slipped on ice." The plaintiff fell on January 21, 2003. A fair reading of the entire record reveals that the plaintiff reported to several doctors that she fell on ice <u>when her left hip gave out from under her.</u> Additionally, the plaintiff didn't merely "cut her eye." She sustained several injuries, and the injuries to her face were so traumatic she needed emergency surgery to repair the wounds.

The plaintiff reported on a Hearing Disability Report, "fell 1-21-03 at sister['s] home...needed to go to ER (Mercy Hosp) & Dr. Collini for eye sutures (L) hip went out couldn't stand on it & fell face down on sidewalk...injured nerves in both hands & tore sinuses open...need surgery." (TR. 125). In fact, one month prior to the fall, Dr. O'Brien reported "She continues to have some pain over the lateral aspect of hip at times. She says it pops out for her and then she has to push it back in and it feels better." (TR. 187).

There is no inconsistency in the plaintiff's statements that she fell on ice on January 21, 2003. Furthermore, objective clinical test results clearly support the plaintiff's stated weakness and pain in her hip and leg. Repeated MRIs revealed a herniated/desiccated disc and/or bulge at L4-5 and associated radiculopathy (TR. 191, 260), and an EMG dated February 18, 2002, was read as abnormal with the findings suggesting the "presence of bilateral L5-S1 Radiculopathy...[and] presence of mild sensory neuropathy." (TR. 265).

Additionally, the ALJ states incorrectly that "There is no medical or psychological opinion in this case which finds that the claimant is totally

unable to work." (TR. 19).  Dr. O'Brien wrote on December 20, 2002:

> She can continue with activities as comfort allows...In my opinion she is going to be unable to work unless her condition is significantly reversed.  She is already status 3 different cancers and she is scheduled to have some additional cancer screening...

(TR. 187).  We note parenthetically that it is unknown whether the plaintiff's primary treating physician has an opinion regarding the plaintiff's residual functional capacity because his records are unintelligible.

Also disturbing is the impatience exhibited by the ALJ in questioning the plaintiff. Early in the hearing the plaintiff's attorney asked her to describe the location of her pain. The transcript reads:

> A.   The cossack (INAUDIBLE) kept two disks out of place and there's two disks out in the middle of the back. From the hip being out of place they said it's hitting the sciatic nerve, which is going across the back, down the cossack (sic)...[4]
>
> ALJ: I don't need anatomy lessons, ma'am, just tell me where it hurts on you.

(TR. 34).

Of even more concern is a subsequent bizarre exchange between the ALJ and the plaintiff.  It must be noted that the plaintiff underwent a radical left mastectomy in August 1994, nine years before the hearing.  The ALJ inquired of the plaintiff:

> ALJ: What do you do socially? Do you see anybody besides your sister and nieces? Are you dating anybody?

---

[4]Presumably, the plaintiff said "buttock."  This is yet another example of the abysmal record created in this case.

11

>    A.   No.
>
>    Q.   Any church or social groups?
>
>    A.   No. I went to church on Ash Wednesday and I couldn't get up and kneel and all that so I only...I had to leave.
>
>    Q.   So what will get you out of the house?
>
>    A.   Doctor's appointments. Only if I have to leave.
>
>    Q.   Out of curiosity did you go parachuting when you went to Las Vegas?
>
>    A.   Pardon me?
>
>    Q.   You were going to go to Las Vegas after your breast surgery, did you go that summer?
>
>    A.   No.
>
>    Q.   And you asked Dr. Kline about parachuting.
>
>    B.   I can't remember...What is power shooting?
>
>    Q.   Parachuting, jumping out of an airplane.
>
>    A.   Oh, no
>
>    Q.   That was just a dream?
>
>    A.   Yeah.

(TR. 47-48).

We have reviewed each of Dr. Kline's records. There is no mention of the plaintiff ever inquiring about the possibility of parachuting. Furthermore, Dr. Kline was not the plaintiff's physician in 1994. Even more importantly, the alleged onset date of disability in this matter is September 5, 2001. Any inquiry into the plaintiff's activities as far back as 1994 is irrelevant to this claim.

We conclude that there is no substantial evidence in the record, as it presently exists, to support the ALJ's conclusion that the plaintiff was capable of modified sedentary work. The ALJ stated that the medical evidence established that the plaintiff was able to lift 10 pounds. (TR. 18). The exhibit the ALJ referred to for this conclusion was the May 14, 2003, report of Jihad Charabati, M.D. The Agency referred the plaintiff to Dr. Charabati for evaluation.[5]  Dr. Charabati indicated on a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities form that the plaintiff was capable of lifting up to 10 pounds <u>only occasionally</u>. He indicated furthermore that the plaintiff had "severe" L-5 radiculopathy, and that she was "unable to walk on toes or heels." He indicated that the plaintiff would be able to walk only 1 hour <u>or less</u> in an 8-hour day. (TR. 295-300)(emphasis added).

Dr. Charabati stated in a written report of the same date that the grasp of the left hand, secondary to the mastectomy, was 2/5 as compared to the right hand which was 5/5.  This finding is consistent with the plaintiff's statement of weakness in her left hand, which the ALJ rejected as not credible.  He stated the plaintiff was not credible in this regard because "she worked close to seven years after the [left breast] surgery as an LPN." (TR. 17).

Once this matter got to the hearing level it was incumbent upon the ALJ

---

[5]Dr. Charabati mysteriously disappeared sometime shortly after the evaluation was done, and the Agency had trouble locating the tape recording he created of his evaluation findings, in order to prepare the report. (TR. 133).

to secure relevant information regarding the plaintiff's entitlement to social security benefits.  *See* Hess v. Secretary of Health, Education and Welfare, 497 F. 2d 837 (3rd Cir. 1974).  Although the burden is upon a claimant to prove her disability, because social security disability proceedings are presumed to be inquisitorial, rather than adversarial, the ALJ is vested with a duty "to investigate facts and develop arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111(2000)(citing Richardson v. Perales, 402 U.S. 389, 400-401 (1971)).  While judicial review in these cases is necessarily deferential to the agency's determination, it must nevertheless be undertaken with a recognition that the "beneficent purposes" underlying the Act are best served in insuring that the Agency has developed a complete evidentiary record. Jozefick v. Shalala, 854 F. Supp. 342, 343-344 (M.D. Pa. 1994)(citations omitted).  "[A] showing that the ALJ failed to develop the record by not eliciting all of the relevant information is a showing of prejudice to the claimant and cause for remand." Jozefick at 350 (citing Hawwat v. Heckler, 608 F. Supp. 106, 109 (N.D. Ill. 1984).

In this case the ALJ should have known that there was a problem with the manner in which the claim had been processed at the Agency level. In a similar case, the Third Circuit Court of Appeal held in Ventura v. Shalala, 55 F.3d 900 (3rd Cir. 1995), that the claimant's due process rights had been violated as a result of the ALJ's failure to fully and fairly develop the record. The Court observed that applicants for social security disability payments, most of whom are truly ill or disabled, are entitled to be treated with respect

14

and dignity no matter what the merits of their respective claims. The Court emphasized the importance of fair procedures. Quoting Rosa v. Bowen, 677 F. Supp. 782, 785 (D.N.J. 1988), the Court stated:

> 'This court has previously criticized this agency's heartlessness in the repeated and unfounded rejection of a multitude of clearly valid claims. However, even in those cases, the unjust results followed seemingly adequate procedures. In this matter there was not even the pretense of a full and fair hearing. Once we [forsake] fairness and due process because of the pressure of heavy caseloads, then our system of justice will end...'

Ventura at 905.

In this case, the plaintiff did not receive a full and fair evaluation of her disability claim. Furthermore, the plaintiff was not treated with respect and dignity. As such the plaintiff's appeal should be granted to the extent that the matter should be remanded to the Commissioner to properly develop and consider the record, and if necessary, provide the plaintiff with a new hearing, before a different ALJ.

## V. RECOMMENDATION.

Based on the foregoing, it is respectfully recommended that the Plaintiff's appeal be **GRANTED**. It is recommended that the matter be remanded to the Commissioner for further proceedings, before a different ALJ, to address the grossly inadequate and unfounded conclusions of the

Commissioner, as set forth above.

                                          <u>s/ Malachy E. Mannion</u>
                                          MALACHY E. MANNION
                                          United States Magistrate Judge

Dated:   MAY 2, 2005

O:\shared\REPORTS\2004 Reports\04-1369.wpd